UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LANA BIND,

                              Plaintiff,

            -against-                                        08 Civ. 11105 (RJH)

                                                    **<u>MEMORANDUM OPINION</u>**
THE CITY OF NEW YORK, THE CITY OF                   **<u>AND ORDER</u>**
NEW YORK DEPARTMENT OF HOUSING
PRESERVATION AND DEVELOPMENT (HPD),
LUIZ C. ARAGON, as Deputy Commissioner of
HPD, and WILLIAM S. CARBINE, as Assistant
Commissioner of HPD,

                              Defendants.


Richard J. Holwell, District Judge:

        Plaintiff Lana Bind commenced this action on December 22, 2008, alleging

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e *et seq.* (2006), the New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. Law § 290 *et seq.* (McKinney's 2010), and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (2010). Now before the Court is defendants'

motion for summary judgment. For the reasons that follow, that motion is GRANTED IN PART

and DENIED IN PART.

## BACKGROUND

**Bind's Initial Employment**

Bind, who identifies as being of the Jewish faith, began working for defendant the City of New York Department of Housing Preservation and Development ("HPD"), on June 10, 2002, as Director of the Queens Borough office of the Division of Neighborhood Preservation ("DNP"). (Defs.' Rule 56.1 Stmt. ¶ 1; Pl.'s Opp'n to Defs.' Stmt. of Material Undisputed Facts ("Pl.'s Opp'n Stmt.") ¶ 4.)[1] HPD is a mayoral agency of the City, dedicated to improving the availability of housing in New York City, and the DNP, a division within HPD's Office of Preservation Services, has the purpose of preserving the existence of privately held housing and halting abandonment of buildings. (*See* Defs.' Rule 56.1 Stmt. ¶¶ 3-5.) Bind was given the civil service title of Administrative Staff Analyst, Non-Managerial when she began her employment with HPD. (*Id.* ¶ 2.) She reported directly to Carol Salgado at first, and then to Ann Marie Mierez, DNP's Director of Field Operations; Mierez in turn reported to Assistant Commissioner William Carbine, who reported to Deputy Commissioner Luiz Aragon. (*Id.* ¶¶ 5-6.) At the time of Bind's appointment, the Queens Borough office of DNP covered Queens and Staten Island,

---

[1] Bind did not comply with Local Civil Rule 56.1(b), which provides that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried," or with Local Civil Rule 56.1(d), which requires each statement in a Local Rule 56.1 statement to "be followed by citation to evidence which would be admissible." Instead, Bind merely submitted a combination counsel's declaration and "Opposition to Defendant's Statement of Undisputed Facts," which sets out Bind's version of the facts in paragraphs that do not correspond to Defendants' Local Rule 56.1 statement, (*compare* Defs.' Rule 56.1 Stmt. *with* Pl.'s Opp'n Stmt.), and does not cite to evidence in every paragraph, (*see, e.g.*, Pl.'s Opp'n Stmt. ¶¶ 24, 31-33, 36.) "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). And "[i]f the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Where the Court cites to a portion of Defendants' Local Rule 56.1 statement or its supportive filings, it is because Bind has failed to controvert that statement properly in her "Opposition." The Court is mindful, of course, that "[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Giannullo*, 322 F.3d at 140 (quoting *Holtz*, 258 F.3d at 74).

and had a relatively low work volume when compared to other borough offices. (*See id.* ¶ 8; Seacord Decl. Ex. E ("Carbine Dep.") at 30.)

On January 28, 2007, Bind was promoted to the managerial civil service title of Administrative Housing Development Specialist; she continued serving as Director of the Queens Borough office. (Defs.' Rule 56.1 Stmt. ¶¶ 9-10.) At some point, she passed the civil service examination for the position of Staff Analyst. (*Id.* ¶ 11.)

**Reorganization of Bind's Office / Hostile Work Environment**

In 2006, several employees in Bind's office retired. (Neubarth Decl. Ex. B ("Bind Dep.") at 31-32; *id.* Ex. E at 4.) As a result, five employees were transferred into the office between July 2006 and July 2007: Jaami Ali (July 24, 2006), Deonarine Purushuttam (December 4, 2006), Carrie Jackson (February 20, 2007), Patricia Friday (April 30, 2007), and Sayed Khalil (July 2, 2007). (Defs.' Rule 56.1 Stmt. ¶ 14; Neubarth Decl. Exs. E, F.) Bind complained repeatedly that the newly transferred employees were detrimental to the operation of her office. (*See* Defs.' Rule 56.1 Stmt. ¶ 19; Bind Dep. at 31-34, 36-37.) For example, Bind e-mailed Susan Carr, Executive Director of Operations for the Office of Preservation Services, and copied Mierez, recommending that Ali be referred to the Disciplinary Unit for "lateness, absenteeism, and related troubled behavior." (Defs.' Rule 56.1 Stmt. ¶ 20; Seacord Decl. Ex. N.) Bind believed that her office was receiving "all the rejects," employees from other units who had experienced disciplinary problems with their supervisors, (Bind Dep. at 31.)

On July 31, 2007, Carbine and David Schmid, Director of Operations for DNP, visited the Queens Borough office to discuss Bind's concerns about her staff. (Defs.' Rule 56.1 Stmt. ¶ 24; Carbine Dep. at 78.) At the meeting, Bind demanded that the new employees be transferred out

of her office. (Neubarth Decl. Ex. F at 3.) After the meeting, it was determined that Ali would be transferred to another office. (Defs.' Rule 56.1 Stmt. ¶ 26.)

On August 15, 2007, Bind wrote a letter to Carbine, with copies to Aragon, Schmid, and Mierez, alleging that the replacement employees had created a "hostile work environment" filled with physical danger and sexual harassment. (Neubarth Decl. Ex. E.) Notably, Bind did not complain that this so-called "hostile work environment" had anything to do with anti-Semitism.

Carbine responded with a letter dated August 29, 2007, which refuted Bind's contentions. (Pl.'s Oppn. Stmt. ¶ 15.) Specifically, the letter stated that Carbine gave Bind a salary increase in March 2007, which "contradict[ed] [Bind's] claim that an unfriendly work environment was purposely created for [her]." (Neubarth Decl. Ex. F. at 2.) The letter asserted that management had adequately addressed Bind's staffing needs, created through retirements, by transferring additional staff. (*Id.* at 3.) The letter stated that "[t]he only employee that [Bind] described as a problem on March 23rd was Jaami Ali," and that Bind, in fact, had stated that she "got along well with Patricia Friday." (*Id.*) Carbine's letter noted that Carrie Jackson was discussed only because Bind had sent an e-mail about her to HPD's Director of Staffing Management "with good intentions but in violation of agency protocol." (*Id.*) With respect to the July 31 meeting, the letter characterized Bind's attitude there as "less than accommodating," and expressed dismay that "[i]nstead of handling the [staff conflict] issues in a responsible manner, [Bind's] solution was to have the staff members transferred out of [her] office." (*Id.*)

**Bind Complains of Anti-Semitism**

In her August 15 letter, Bind also accused Carbine of making an "intimidating and derogatory" remark at the July 31, 2007 meeting. (Pl.'s Oppn. Stmt. ¶ 9.) At the meeting, Bind had raised a number of personnel complaints, and Carbine, in response, allegedly told her to "do

a mitzvah." (Neubarth Decl. Ex. E), which to Bind implied a "[c]ommandment or directive" to stop complaining about "discriminatory [treatment], racial slurs and hostile work atmosphere." (*Id.*). Bind felt that "any reasonable person" would interpret Carbine's use of the term as anti-Semitic. (Neubarth Decl. Ex. E at 6.) In an August 29, 2007 letter, Carbine replied that he understood the word "mitzvah" to mean "good deed," and that nothing was derogatory about his use of the term. (Neubarth Decl. Ex. F at 3.)[2]

No other racial slurs or statements of anti-Semitism were identified by Bind in her August 15 letter, HRD complaint, EEOC complaint, or complaint in the present action. However, during her deposition in this case, Bind for the first time alleged that anti-Semitic behavior was rampant at more than a dozen director meetings and project meetings beginning in 2006, including (i) deliberate mispronunciations (including one by defendant Carbine) of the names of Jewish landlords; (ii) comments at these meetings (including one by Mierez) that certain Jewish landlords were "stingy" or "trying to save money"; and (iii) a single statement by an unidentified meeting participant that HPD should publish a brochure in Yiddish to remind Jewish landlords to follow the code. (Bind Dep. at 39-42.)

**Reorganization of DNP Offices / "Reasonable Accommodation" Request**

In October 2007, Aragon and Carbine decided to reorganize DNP borough offices. (Defs.' Rule 56.1 Stmt. ¶ 36.) Seven of the nine directors in DNP were rotated between offices, (*Id.* ¶ 38), imitating a staff rotation of Code Enforcement directors that had proved highly beneficial to that division in the past, (Seacord Decl. Ex. S.) The Staten Island operations would be moved from the Queens office to the Brooklyn office, and the Brooklyn office would be split in two,

---

[2] The word apparently has both meanings. "Mitzvah" is derived from the Hebrew "miswah," meaning "commandment," but also has the common meaning of a "precept; something which should be done; hence a good deed done as a religious duty, without expectation of earthly reward." IX *Oxford English Dictionary* 914 (2d ed. 1991).

with about 40% of that office's employees moving to a new "Brooklyn East" office, located only six miles from the Queens office. (Defs.' Rule 56.1 Stmt. ¶¶ 37, 40.) As part of this rotation, Bind was transferred from the Queens office to the Brooklyn East office. (*Id.* ¶ 38.)

On October 12, 2007, Bind was informed of the planned redeployment of directors, to become effective the first week of November. (*Id.* ¶ 42, Bind Dep. at 104-105.) On October 15, 2007, Bind e-mailed Carbine requesting an exemption from the planned reorganization. (Defs.' Rule 56.1 Stmt. ¶ 43.) In that e-mail, Bind stated that the transfer would create child-care issues regarding her two-year old daughter, and that the transfer would constitute a "reduction of responsibility, jurisdiction, and authority." (*Id.* ¶ 44, Seacord Decl. Ex. U.) On that same date, Bind also wrote to Stanley Whing, HPD's Equal Employment Opportunity ("EEO") officer, asking to remain at the Queens office as a "reasonable accommodation" in view of her child-care issues. (Defs.' Rule 56.1 Stmt. ¶ 45; Seacord Decl. Ex. V.)

On October 16, 2007, Carbine denied Bind's exemption request. (Defs.' Rule 56.1 Stmt. ¶ 46; Seacord Decl. Ex. S.) Carbine stated that Bind's "family issues" had been considered in the decision to transfer her to the Brooklyn East office, as opposed to one of the other borough offices. (Defs.' Rule 56.1 Stmt. ¶ 46) Carbine also stated that Bind's workload and responsibility would actually increase at the Brooklyn East office. (*Id.* ¶ 47.)

On that same date, Whing addressed Bind's accommodation request. (*Id.* ¶ 48; Seacord Decl. Ex. W.) Whing stated that his office lacked formal jurisdiction to address conflicts with child or family care responsibilities, and could only address requests for accommodations based on disability, status as a victim of domestic violence, or religious need. (Defs.' Rule 56.1 Stmt. ¶ 48; Seacord Decl. Ex. W.)

On October 30, 2007, Bind again asked Whing for an accommodation, this time seeking exemption from the transfer based on religious observance. (Defs.' Rule 56.1 Stmt. ¶ 50; Seacord Decl. Ex. Z.) Bind noted that she attended services at a Synagogue five minutes from the Queens office "in the morning enroute to work, in the afternoon during my lunch time and again in the evening enroute home," and that she also attended religious educational activities in the nearby neighborhood of Rego Park. (Seacord Decl. Ex. Z.) Bind alleged that there were no similar institutions "immediately contiguous" to the Brooklyn East office. (*Id.*)

On November 1, 2007, a meeting was held between Bind, Whing, Plaintiff's counsel Neubarth, and Paul Schreiber, an agency attorney. (Defs.' Rule 56.1 Stmt. ¶ 52; Seacord Decl. Ex. AA; *see also* Bind Dep. at 135-36.) At this meeting, Bind gave a detailed explanation of her need to attend services with fellow people of Russian origin, and expressed doubts that any other synagogue would suffice. (Bind Dep. at 136; Seacord Decl. Ex. AA.)  On November 8, 2007, Whing again denied Bind's request for exemption from the transfer. (Defs.' Rule 56.1 Stmt. ¶ 54; Seacord Decl. Ex. AA.) In a memorandum, Whing informed Bind that she would, however, be granted certain accommodations to facilitate synagogue attendance: (1) a flex arrival time that would allow her to attend the 9:00am services she identified; (2) a two-hour lunch break to attend midday services at a nearby synagogue; and, (3) the option to leave early on Fridays for Sabbath observance. (Defs.' Rule 56.1 Stmt. ¶ 55; Seacord Decl. Ex. AA.)

Meanwhile, in November 2007, Bind was called for a position with the New York City Department of Design and Construction. (*Id.* ¶¶ 12, 13.) To keep her within the agency, HPD elected on November 8, 2007 to give her a tenure track appointment to Staff Analyst, with a leave from that position so that she could continue to be a managerial employee. Bind's transfer to the Brooklyn East location also occurred on November 8, 2007. (*See* Neubarth Decl. Ex. I.)

(*Id.*) A Certificate of Approval of HPD's election was eventually issued on February 5, 2008. (Seacord Decl. Ex. I.)

Bind asked for reconsideration of her request for religious accommodation on November 14, 2007. (Defs.' Rule 56.1 Stmt. ¶ 56; Seacord Decl. Ex. BB.) In a letter to Whing, Bind stated that a two-hour lunch break would be insufficient to allow her to attend midday services at her original synagogue, and that no nearby synagogue was compatible with her beliefs. (Defs.' Rule 56.1 Stmt. ¶ 56; Seacord Decl. Ex. BB.) Her request for further accommodation was denied on November 20, 2007. (Defs.' Rule 56.1 Stmt. ¶ 57; Seacord Decl. Ex. CC.)

From November 27, 2007 to January 7, 2008 Bind, Mierez, and Whing exchanged e-mails regarding permission to leave work between 11:00AM and 12:00PM on Fridays, in order for Bind to attend to her Sabbath needs. (Defs.' Rule 56.1 Stmt. ¶¶ 60-62; Seacord Decl. Ex. DD.) In a December 18, 2007 e-mail, Bind stated that her new work location prevented her from attending services and educational activities during the week, and that she was only able to attend these activities on Friday before the Sabbath. (Defs.' Rule 56.1 Stmt. ¶ 62; Seacord Decl. Ex. DD.) However, in a response dated January 7, 2008, Mierez reiterated that Bind was not to leave before 1:00PM on Fridays. (Seacord Decl. Ex. EE; *see also* Bind Dep. at 144.)

In January of 2008, Bind began participating in individual Jewish educational seminars at the Educational Center for New Americans, which took place on Wednesday afternoons and sometimes on Friday afternoons. (Pl.'s Oppn. Stmt. ¶ 22.) In a January 7, 2008 e-mail, Mierez approved a 2:00PM release time on Wednesdays for Bind to obtain religious instruction. (Defs.' Rule 56.1 Stmt. ¶ 63; Seacord Decl. Ex. EE; *see also* Bind Dep. at 144.) This accommodation was merely an early leave schedule, and Bind continued to work the required 35 hour week. (Pl.'s Oppn. Stmt. ¶ 24.)

**Formal EEO Complaint**

On October 24, 2007, while her accommodation requests were still under consideration, Bind lodged an internal complaint with HPD's EEO office. (Defs.' Rule 56.1 Stmt. ¶ 49; Pl.'s Opp'n Stmt. ¶ 20.) In her complaint, Bind raised claims of religious discrimination and retaliation against Carbine and Aragon. (Neubarth Decl. Ex. G.) In particular, Bind complained that Carbine used the word mitzvah in a "derogatory" and "discriminatory" context, that she was told to cease her "expression of dismay over the manner in which [she had] been treated (discriminatory, racial slurs and hostile work atmosphere)," and that she had concluded that she was subject to "discriminatory Anti Semitic treatment designed to create a hostile work atmosphere, infliction of emotional distress with the goal of tender resignation because I have chose [sic] to complain about Anti-Semitic Approach." (*Id.*) Bind also alleged that her transfer was "a form of retaliation for complaining against Anti-Semitic Treatment." (*Id.*)

Bind's EEO complaint was denied on March 10, 2008. (Defs.' Rule 56.1 Stmt. ¶ 74; Seacord Decl. Ex. MM.) The EEO office found that Bind's allegations in the complaint were unsubstantiated. (Defs.' Rule 56.1 Stmt. ¶ 74.)

**Attempted CCHR Complaint**

On or about November 28, 2007, Bind attempted to file a complaint of discrimination with the New York City Commission on Human Rights ("CCHR"). (Defs.' Rule 56.1 Stmt. ¶ 58; Seacord Decl. Ex. OO.) In her complaint, Bind alleged that Carbine and Aragon discriminated against her and retaliated against her by using "discriminatory and anti-Semitic terms" and "threatening" her. (Defs.' Rule 56.1 Stmt. ¶ 58; Seacord Decl. Ex. OO.)

Bind's complaint was refused by the CCHR, in part because her EEO Complaint was still pending. (Defs.' Rule 56.1 Stmt. ¶ 59; Seacord Decl. Ex. PP.)

**Formal EEOC Complaint**

On or about January 18, 2008, Bind filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging religious discrimination and retaliation. (Defs.' Rule 56.1 Stmt. ¶ 64; Pl.'s Opp'n Stmt. ¶ 20; Neubarth Decl. Ex. H.) In her EEOC charge, Bind complained that (1) on June 22, 2007, Carbine used a discriminatory and anti-Semitic term (mitzvah); (2) on August 7, 2007, Bind "was threatened and told to stop complaining about Anti-Semitic treatment or look for another job;" (3) on November 8, 2007, Bind was transferred to another work location; and (4) on November 8, 2007, Bind's request for a reasonable accommodation of her "religious observance needs" was rejected. (Defs.' Rule 56.1 Stmt. ¶ 65; Neubarth Decl. Ex. H.) After Bind's employment was terminated, Bind amended her charge to include that her termination constituted a further act of retaliation by HPD. (Defs.' Rule 56.1 Stmt. ¶ 80; Seacord Decl. Ex. QQ.)

On or about September 24, 2008, the EEOC issued Bind a notice stating that it was unable to conclude that the information obtained established statutory violations, and informing Bind of her right to initiate suit under Title VII. (Defs.' Rule 56.1 Stmt. ¶ 81; Neubarth Decl. Ex. I.)

**Bind's Surveillance and Termination**

Sometime before February 8, 2008, someone at HPD[3] ordered that Bind be placed under surveillance on the days of her religious accommodation. (Defs.' Rule 56.1 Stmt. ¶ 66.) The City maintains that it initiated the surveillance because of inconsistencies in Bind's statements regarding her need for an accommodation, and because of her request to leave work on Wednesdays was unusual. (*Id.*) From the factual record, these alleged inconsistencies appear to

---

[3] Carbine denied knowing who ordered the surveillance, (Carbine Dep. at 46), and neither Bind nor Defendants have alleged that a particular party is responsible.

be Bind's shifting requests to remain at the Queens Borough office for child-care reasons, then to remain at the Queens Borough office for religious reasons, then to receive religious exemptions to her schedule.

HPD investigator Robert Holliday conducted surveillance of Bind on at least six occasions: (i) Friday, February 8, 2008; (ii) Friday, February 15, 2008; (iii) Wednesday, February 20, 2008; (iv) Wednesday, February 27, 2008; (v) Friday, February 29, 2008; and (vi) Wednesday, March 5, 2008. (*Id.* ¶ 67.) Although Bind was never seen engaging in religious instruction on these dates, (Naidu-Walton Decl. ¶ 6), Bind alleges that HPD's surveillance often observed her merely taking her lunch break after work, (Pl.'s Opp'n Stmt. ¶ 26), or attending to shopping and preparation for the Sabbath, which she alleges was itself a religious observance, (*Id.* ¶ 27.) In particular:

(i)    On Friday, February 8, 2008, Holliday saw Bind leave work at approximately 1:34PM, arrive at a Bally's Total Fitness at 2:02PM, and leave again at 3:14PM. (Defs.' Rule 56.1 Stmt. ¶ 68.) Bind, for her part, claims that she was at Bally's to have lunch at the juice bar, and not to use the exercise facility. (Pl.'s Opp'n Stmt. ¶¶ 34-35.) Bind further alleges that her Rabbi "called and cancelled" while she was in Queens on this day, and that accordingly she "did shopping in preparation for Sabbath and went home." (Neubarth Decl. Ex. L.)

(ii)   On Friday, February 15, 2008, Holliday saw Bind leave work at approximately 1:18PM and proceed to the same Bally's Total Fitness, where she arrived at 1:49PM. Bind spent approximately one hour at Bally's, and surveillance was terminated at 3:00. (Defs.' Rule 56.1 Stmt. ¶ 69.) Again, Bind alleges that she was at Bally's to have lunch at the juice bar, and not to use the exercise facility. (Pl.'s

11

Opp'n Stmt. ¶¶ 34-35.) Bind additionally claims that her meeting this day was "cancelled due to Sabbath approaching too soon," and that accordingly she "went directly home to prepare for Sabbath." (Neubarth Decl. Ex. L.)

(iii)    On Wednesday, February 20, 2008, Holliday saw Bind leave work at approximately 1:27PM and proceed to her residence in Hollis Hills, NY, where she spent approximately one hour, at which time the surveillance was terminated. (Defs.' Rule 56.1 Stmt. ¶ 70.) Bind alleges that Mierez approved a 1:30 PM departure for Bind to "stop by home for personal business" and stay with her daughter until her grandmother could return from a doctor's appointment. (Neubarth Decl. Ex. L.)

(iv)    On Wednesday, February 27, 2008, Holliday arrived at Bind's workplace but did not see her vehicle parked there. (Defs.' Rule 56.1 Stmt. ¶ 71.) Holliday proceeded to Bind's residence, where he observed her vehicle parked outside until 2:22PM, at which time she proceeded to Creedmoor Psychiatric Center and spent over an hour before the surveillance was terminated. (*Id.*) In an e-mail on the morning of the 27th, Bind had received approval from Mierez for a noon Dentist's appointment on this day. (Neubarth Decl. Ex. K.)

(v)    On Friday, February 29, 2008, Holliday observed Bind leave work at approximately 1:26PM and proceed to her residence in Hollis Hills, NY, where she remained until at least 3:32PM, at which time the surveillance was terminated. (Defs.' Rule 56.1 Stmt. ¶ 72.) Bind alleges that she "left the office too late" on this date, and "went directly home for Sabbath." (Neubarth Decl. Ex. L.)

(vi)     On Wednesday, March 5, 2008, Holliday observed Bind leave work at
approximately 2:14PM and proceed to Vista Diagnostic Imaging Center, where
she remained for approximately 45 minutes and then exited; the surveillance was
terminated soon thereafter when Holliday lost sight of Bind. (Defs.' Rule 56.1
Stmt. ¶ 73.) Bind alleges that she had a Doctor's appointment at 3:00PM, that
Mierez was notified of the appointment, and that she met with her Rabbi at
4:30PM that day. (Neubarth Decl. Ex. L.)

In summary: on five of the six observation days Bind concedes she did not meet with her
Rabbi; however, on two of those five days she suggests that she was observed merely eating
lunch; and on two other of those five days she suggests that she was observed attending pre-
approved medical appointments.

After this period of surveillance, on March 24, 2008, Dawn Naidu-Walton, HPD's
Director of Discipline and Labor Relations, met with Bind. (Defs.' Rule 56.1 Stmt. ¶ 75.) At the
meeting, Naidu-Walton asked Bind if she still needed to leave early to obtain religious
instruction and comply with her Sabbath observance obligations. (*Id.*; Naidu-Walton Decl. ¶ 7.)
Bind stated that the reasons she gave to Whing for leaving early on Wednesdays and Fridays still
existed, and that she was using the early departure time to obtain religious instruction from two
Rabbis. (Defs.' Rule 56.1 Stmt. ¶ 76; Naidu-Walton Decl. ¶ 8.)

From March 26, 2008, until May 14, 2008, Bind did not leave work early on
Wednesdays, but continued to leave early on Fridays. (Neubarth Decl. Exs. K, L.)

On May 14, 2008, Bind received two letters from HPD Deputy Commissioner Bernard
Schwartz, terminating her employment. (Defs.' Rule 56.1 Stmt. ¶ 79; Pl.'s Opp'n Stmt. ¶ 29;
Neubarth Decl. Ex. M.) On that same date, Bind met with Naidu-Walton and Carr. (Defs.' Rule

56.1 Stmt. ¶ 78.) At the meeting, Bind was informed that HPD surveillance had revealed that she was not using her early departure time for religious obligations, but rather, that she was using that time to go to the gym, shop, and perform other non-related activities. (Defs.' Rule 56.1 Stmt. ¶ 78; Naidu-Walton Decl. ¶ 10.) Bind was told that HPD had lost the ability to trust her as a manager, based on her dishonesty and her abuse of the accommodation granted to her. (Defs.' Rule 56.1 Stmt. ¶ 78; Naidu-Walton Decl. ¶ 10.)

On December 22, 2008, within 90 days of receipt of her EEOC Right to Sue letter, Bind brought this suit. (Defs.' Rule 56.1 Stmt. ¶ 82.)

## DISCUSSION

### I. Summary Judgment Standard

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). There must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor to create an issue for trial. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50

14

(citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *Nat'l Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts . . . ." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case," especially "where ... the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona College,* 521 F.3d 130, 137 (2d Cir. 2008). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

## II. Title VII Religious Discrimination Claims

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual or otherwise to discriminate against any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). An individual's "religion" includes not just religious beliefs, but "all aspects of religious observance and practice," unless the employer demonstrates that it is unable to reasonably accommodate that observance or practice "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

A plaintiff may claim a violation of religious discrimination under Title VII under theories of either disparate treatment or denial of reasonable accommodation. *See, e.g., Feingold v. New York,* 366 F.3d 138 (2d Cir. 2004) (disparate treatment); *Cosme v. Henderson,* 287 F.3d 152 (2d Cir. 2002) (denial of reasonable accommodation). A disparate treatment claim, in turn, may be

established by showing either (1) adverse job action under circumstances giving rise to an inference of discrimination on the basis of religion, or (2) harassment on the basis of religion that amounts to a hostile work environment. *Feingold,* 366 F.3d at 149.

## A. Disparate Treatment – Adverse job actions

To establish a *prima facie* case of Title VII disparate treatment, an employee must show (1) that she belonged to a protected class, (2) that she was qualified for the position she held, (3) that she suffered an adverse employment action, and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Feingold*, 366 F.3d at 152.

An adverse employment action is a "materially adverse change" in the terms and conditions of employment, one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Examples of materially adverse changes include "hiring, firing, failing to promote, reassignment with significantly different responsibilities," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), or a "demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation," *Galabya*, 202 F.3d at 640 (quoting *Crady,* 993 F.2d at 136).

If an employee makes out a *prima facie* case, a rebuttable presumption of discrimination arises, and her employer must "articulate a legitimate, clear, specific and non-discriminatory reason" for the employment action. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir. 1995); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

Once the employer articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted, and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (citation omitted). The burden then shifts back to the employee to show, without the benefit of any presumptions, that the proffered reason was a pretext and that the employer's decision was motivated, at least in part, by a discriminatory reason based on the employee's protected status. *See id.* at 515-16; *Stern v. Trustees of Columbia University in City of New York,* 131 F.3d 305, 312 (2d Cir. 1997); *Lanier v. I.B.M. Corp.*, 319 F. Supp. 2d 374, 381 (S.D.N.Y. 2004). If the employee's evidence was barely sufficient to make out a *prima facie* case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale. *Stern*, 131 F.3d at 312. Nevertheless, for a summary judgment motion in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. *See Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000); *Stern*, 131 F.3d at 314.

Bind identifies as Jewish, and defendants do not contest that Bind is therefore a member of a protected class. She was employed by HPD as a director from 2002, and continued to enjoy agency support through 2007, and so was presumptively qualified for the position she held. Bind identifies two families of adverse employment actions: (1) "termination," which included "tr[ying] to establish that the Plaintiff was misappropriating a religious accommodation;" and (2) "negative conduct against her that made her environment hostile," which included "the ntentional use of Jewish/Hebrew words to intimidate her." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Summ. J. Opp'n Stmt.") at 5.)[4]

---

[4] At times, Bind has also implied that her supervisors' various staffing decisions, including the decision to transfer Bind to the Brooklyn office, constituted adverse employment actions. Bind has provided no evidence that HPD's

Construing the facts surrounding Bind's surveillance in her favor, the court concludes for the purpose of this motion that Bind's surveillance constituted an adverse employment action. Even if Bind was unaware of the surveillance, it caused her (and would cause a reasonable employee) to be subject to "significantly different responsibilities." *Id.* Surveillance in general is also "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640. Bind's termination also clearly constituted an adverse employment action. *See Ellerth*, 524 U.S. at 761. Since the surveillance and termination arose from Bind's religious accommodation requests, religious discriminatory intent is plausible. Bind has thus made out a *prima facie* case with respect to her surveillance and termination.

The City, however, articulates a legitimate, non-discriminatory reason for the surveillance. Bind initially asked her supervisor and HPD's EEO officer for an "accommodation" exempting her from transfer to the Brooklyn East office, in view of her child-care responsibilities and a perceived reduction in responsibility. When Whing told Bind that his office could only review religious accommodations, she immediately asked for a religious accommodation which would accomplish the same goal and allow her to remain in Queens. After again being turned down, Bind began asking for religious accommodations as to her work hours instead. The

staffing decisions at the Queens Borough office were intentionally directed at her, as opposed to any of the other employees there. Bind also gives no evidence that the challenges presented by HPD's staffing transfers were not within the job responsibilities of a director. *See Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("subjective, personal disappointments do not meet the objective indicia of an adverse employment action"). Further, Bind has presented only unsupported allegations to counter her employer's representation that Bind's transfer was lateral in responsibility and pay. Lateral transfers are generally not considered adverse employment actions, regardless of whether the employee views the transfer negatively. *See Watson v. Paulson*, 578 F.Supp. 2d 554, 563 (S.D.N.Y. 2008). In any event, Bind makes no reference to staffing decisions or transfers in her opposition to the present motion for summary judgment. (Pl.'s Summ. J. Opp'n Stmt. at 5.) ("Plaintiff claimed that there were two negative employment actions. First, her termination, and secondly, negative conduct against her that made her work environment hostile.") Accordingly, the Court finds that Bind has abandoned her claims as against HPD's transfers, and that the City is entitled to summary judgment on these claims. *See Giovanna v. Beth Israel Med. Ctr.*, 651 F.Supp.2d 193, 208 n.108 (S.D.N.Y. 2009) (collecting cases supporting proposition that failure to provide argument on a point at issue constitutes abandonment of the issue); *see, e.g., Ballard v. Children's Aid Soc'y*, Case No. 09 Civ. 5263 (VM), ___ F.Supp.2d ___, 2011 WL 1664980 at *10 (S.D.N.Y. Apr. 28, 2011).

18

inconsistent justifications for Bind's accommodation requests were enough for HPD to question their sincerity. An employer asked to grant a religious accommodation is permitted to examine whether the employee's beliefs regarding the accommodation are sincerely held. *Burns v. Warwick Valley Central School Dist.*, 166 F. Supp. 2d 881, 889 (S.D.N.Y. 2001) (recognizing that school district was permitted to interview teachers to examine their religious sincerity before granting Title VII accommodations to their work schedule); *Hussein v. Waldorf-Astoria*, 134 F. Supp. 2d 591, 594 (S.D.N.Y. 2001) (dismissing religious discrimination claim against hotel that refused to let employee wear a beard to his catering job, where hotel had reason to doubt the sincerity of his religious reasons for not shaving); *see Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481-82 (2d Cir. 1985) (holding that examination of sincerity may be necessary under Title VII to "differentiat[e] between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud," and that "an adherent's belief would not be sincere if he acts in a manner inconsistent with that belief . . . .") (internal quotations and citations omitted).

The City also articulates a legitimate, non-discriminatory reason for Bind's firing. HPD observed Bind on six occasions during which she was exempt from regular working hours for religious reasons, and never once saw her attend religious instruction or a synagogue. When the City confronted her about her continued use of the exemption time, Bind again asserted that she was using the time for religious instruction. Two months later, Bind's position was terminated for her perceived dishonesty about her use of the accommodation. Dishonesty is a legitimate, non-discriminatory reason for terminating an employee, *see Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 169 (2d Cir. 2001); *Sandman v. Mediamark Research, Inc.*, No. 00 Civ. 6529 (JSM), 2002 WL 424660, at *7 (S.D.N.Y. Mar. 18, 2002).

Together, these reasons rebut Bind's *prima facie* case. Therefore, Bind's adverse employment action only survives if she has alleged sufficient facts from which a jury could find that HPD's reason was pretextual, or that HPD's decision was motivated, at least in part, by a discriminatory reason based on her protected status.

The court identifies the following evidence from the factual record in support of Bind's discriminatory termination claim. First, HPD's surveillance was focused only on Bind's days of religious accommodation. Second, HPD's surveillance was sloppy, or at least inconclusive, insofar as HPD only observed Bind for an hour or two each day. Bind alleges that she was often observed taking lunch immediately after work, and that surveillance was terminated before she met (or would reasonably have met) with her rabbi. Bind also claims that HPD pointlessly surveilled her on two days (February 27, 2008 and March 5, 2008) on which her supervisor had approved early leave for medical appointments, although Bind has only submitted e-mails supporting one of these claims. Third, Bind apparently was never given a hearing, review, or other opportunity to explain her use of the accommodation time. Further, Bind was never given written confirmation of the reasons for her termination, and was never told who ordered her termination. Fourth, Bind alleges general anti-Semitic animus among her supervisors and co-workers, as evidenced by the comments allegedly made by Carbine, Mierez and others in the monthly meetings, including the "mitzvah" comment.

The court identifies the following evidence in rebuttal of Bind's claim. First, on all three Wednesdays that Bind was surveilled, HPD never saw her meet with her rabbi. Further, on two of the three Fridays that Bind was surveilled, HPD saw her drive immediately from work to the gym, and not to any apparent Sabbath obligations. Second, Bind allegedly stated to HPD in March that she was using her departures for religious reasons, contradicting HPD's observations

and allowing HPD to question her honesty. The City argues that this was sufficient ground for her termination in May, although no formal policy has been offered to this effect. Third, HPD elected on November 8, 2007 to give Bind a tenure track appointment, even as she was negotiating her religious accommodation requests. Fourth, Bind was ultimately granted a religious accommodation. Fifth, Carbine offers an alternative, neutral interpretation of the "mitzvah" comment. Sixth, Bind's allegations of general anti-Semitic animus at supervisory meetings were raised only at her deposition, but surprisingly not in her EEOC complaints or any of her previous complaints to her supervisors.

Considering the evidence as a whole, resolving all conflicts and drawing all reasonable inferences in Bind's favor, the court finds that a reasonable jury could conclude that Bind's religion was a motivating factor in her discharge. *See Goldschmidt v. N.Y. State Affordable Housing Corp.*, 380 F. Supp. 2d 303, 314-318 (S.D.N.Y. 2005). In *Goldschmidt*, an orthodox Jewish state employee claimed that he was discriminatorily terminated, as evidenced by the negative feedback he received each time he requested a religious accommodation to his work schedule. The feedback included performance appraisals that referenced his "special needs" and his "shrewd attention to examining what further accommodations he could be given." *Id*. at 315. Goldberg also alleged a background of anti-Semitic comments by his supervisors and co-workers. *Id.* His municipal employer offered evidence of Goldschmidt's poor job performance as grounds for his termination, denied that any animus was present behind the feedback and, and noted that the requested accommodations were granted. The court refused to grant summary judgment to the employer, noting that "[w]hile defendants maintain that their unhappiness was not with the aspects of plaintiff's schedule pertaining to religious accommodation but rather his inconsistent and late arrival time, such a factual dispute must be left to the fact-finder." *Id.* at

21

316. The *Goldschmidt* court also reasoned that, while the term "shrewd" is not an overt reference to Judaism, based on historical stereotypes a reasonable jury could conclude that it was not a neutral comment. *Id.*

In the present case, a material question of fact exists as to whether HPD was motivated solely by Bind's apparent dishonesty, or whether HPD's surveillance and Bind's resulting termination were a contrived response to her repeated requests for accommodations. Further, as in *Goldschmidt,* a jury must decide whether Bind's supervisors truly made dozens of comments about problematic Jewish landlords, and whether those comments were made neutrally or evidenced discriminatory intent. Finally, fact questions remain as to who was responsible for making the final decision to terminate Bind, and why.

In sum, although the City has introduced evidence that Bind's termination was based on legitimate grounds, it has not succeeded in precluding an inference that the legitimate reasons proffered for Bind's discharge served as a pretext for a true discriminatory motive. "As both inferences are permissible, '[i]t remains the province of the finder of fact to decide which inference should be drawn.'" *Rosenblatt v. Bivona & Cohen, P.C.*, 969 F.Supp. 207, 219 (S.D.N.Y. 1997) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 206 (2d Cir. 1995); *see also Goldschmidt*, 380 F. Supp. 2d at 317 (refusing to dismiss claim where a reasonable jury could find that defendants dismissed plaintiff, "at least in part, because of his religion and concomitant need for religious accommodation.").

Accordingly, defendants' motion for summary judgment as to Bind's Title VII religious discrimination claims is denied.

**B. Disparate Treatment - Hostile Work Environment**

To prevail on a hostile work environment claim under Title VII, an employee must first show that she suffered harassment "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Feingold,* 366 F.3d at 149 (internal quotations and citations omitted). To survive summary judgment, the employee "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000) (internal quotations and citations omitted). The misconduct must be sufficiently severe or pervasive to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive. *Goldschmidt,* 380 F. Supp. 2d at 311 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998) and *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

Where "reasonable jurors could disagree as to whether alleged incidents of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson v. County of Oneida,* 375 F.3d 206, 227 (2d Cir. 2004). However, to survive summary judgment, a plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir. 1996).

As evidence of a hostile work environment, Bind points to (1) workplace friction between the new co-workers in Bind's office, friction which Bind argues HPD was slow to ameliorate; (2) the one-time use of the word "mitzvah" by defendant Carbine in the June 22, 2007 meeting; (3) a single statement by an unidentified participant of a directors meeting that HPD should publish a

23

brochure in Yiddish to remind Jewish landlords to follow the city's housing code; and (4) insulting comments about Jewish landlords (including comments and deliberate mispronunciations by Carbine and Mierez) at over a dozen meetings beginning in 2006.

      Bind's complaints of colloquial "hostility" between co-workers are irrelevant to her Title VII claims. It is clear from the record that Bind's grievances with her organization began in 2006, when retiring employees in Bind's original office were replaced by five new, problematic workers. However hostile these employees may have been with each other, and however that might have affected the quality of Bind's workplace, Bind has not alleged directly or indirectly that her five troublesome co-workers harassed anyone on the basis of religion.

      The one-time suggestion to "do the brochure in Yiddish" cannot be reasonably imputed to HPD absent attribution to a particular speaker or meeting, and thus cannot support Bind's Title VII claims.

      As for Carbine's comment to "do a mitzvah," the City rightly notes that Carbine's understanding of the term's meaning, "good deed," makes grammatical sense in context ("do a good deed"), while Bind's proposed definition, "commandment," does not ("do a commandment"). But accepting *arguendo* that Carbine intended to issue a command to Bind, that action would not "alter" the condition of her work environment, *Cruz,* 202 F.3d at 570, and would instead be consonant with the supervisor-supervisee relationship. In New York City, where Yiddish terms are regularly used by both Jews and non-Jews, a single and legitimate workplace instruction issued in Yiddish cannot reasonably be found "severe or humiliating" for Title VII purposes.

      This leaves only the insults to Jewish landlords at HPD's supervisors meetings. The court assumes, as it must for this motion, that HPD's supervisors meetings were as riddled with jibes

as Bind describes, and that Bind was subjectively offended (although a reasonable jury might question why Bind, if so offended, omitted any mention of the meetings and insults in her EEOC complaint). Nevertheless, Bind's claim fails because she has not shown that these comments causally affected the conditions of her employment. *Compare Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004), *with Goldschmidt*, 380 F. Supp. 2d at 312.

In *Feingold*, the Second Circuit reversed a grant of summary judgment as against a hostile work environment claim, where the plaintiff had provided evidence that "a reasonable employee in his position would have experienced the conditions of his employment as altered for the worse." *Feingold*, 366 F.3d at 151. Feingold, a Jewish administrative law judge ("ALJ") for the state department of motor vehicles, had identified multiple instances of religious insult in his workplace. Feingold alleged (1) that anti-Semitic remarks, such as the mocking of Feingold's name using other "Jewish-sounding" names and comments about Jewish lawyers, were routine; (2) that he received anti-Semitic remarks from his colleague on an "almost daily" basis on account of his religion (like "What's wrong with these [Jewish] people?"); and (3) that his supervisor admitted that he had been aware of anti-Semitism in the office for years. *Id.* at 150-51. Significantly, the parties admitted that new ALJs relied on more experienced ALJs to provide peer training, feedback and guidance, and Feingold alleged that he received much less training and mentoring than did an African-American, heterosexual, Christian judge hired shortly after he was. This comparison, the Second Circuit held, could allow a reasonable jury to conclude that Feingold's colleagues decided not to train him on the basis of religion-based animus. Feingold, therefore, had pled a causal link between the workplace jibes and the terms of his employment.

In *Goldschmidt*, the plaintiff likewise identified multiple instances of religious insult, including (1) a comment by a superior that "Orthodox Jews are intolerant and contemptuous of

other Jews;" (2) the aforementioned singling out of Goldschmidt for his "shrewd attention to examining what further accommodations he could be given;" and (3) the "laughter and ridicule" he experienced at an office holiday party where he stated that the historical figure he would most like to meet was Chassidic master Red Nachman of Breslov. *Goldschmidt*, 380 F. Supp. 2d at 312. The *Goldschmidt* court, however, denied his hostile work environment claims, finding that the insults were "isolated and not severe or threatening," and, importantly, that there was no evidence that the incidents "interfered with his work performance." *Id.*

Taken together, *Feingold* and *Goldschmidt* warrant the dismissal of Bind's hostile work environment claims. Even if the supervisor meetings were as Bind describes them, nothing suggests that her supervisors' comments about Jewish landlords, though offensive, worsened the conditions of Bind's employment. To the extent Bind's workplace was made different from anyone else's, the insults she alleges are, as in *Goldschmidt,* isolated and not severe. Moreover, unlike in *Feingold* and *Goldschmidt*, the insults and parodies Bind identifies are directed exclusively at people other than her. Acts that amount to mere utterances which engender offensive feelings in an employee do not sufficiently affect the conditions of employment to implicate a hostile environment claim. *Alers v. New York City Human Resources Admin.*, No. 06 Civ. 6131 (SLT) (LB), 2008 WL 4415246, at *6 (E.D.N.Y. Sept. 24, 2008) (citing *Harris*, 510 U.S. at 21). In short, no reasonable juror could find, on the basis of the supervisor meetings alone, that the conditions of Bind's employment were altered.

Because the factual record cannot establish a hostile work environment under Title VII, defendants' motion for summary judgment as to this claim is granted.

## C. Denial of Reasonable Accommodation

To the extent that Bind once claimed denial of religious accommodation, that claim is now deemed waived.

Bind twice sought religious accommodations from HPD. Her requests for religious exemption from office reassignment were denied, while her requests for early departures on Wednesdays and Fridays for religious obligations were partially granted. Although Bind complained in her EEOC complaint that she was denied religious accommodation, her filings in the present case nowhere mention this. Further, Bind wholly ignores the City's colorable and adequate legal and factual grounds for denying this claim. Having failed to address the City's viable summary judgment arguments on this claim, it is deemed waived. *See, e.g., Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004); *Bateman v. Project Hospitality, Inc.*, No. 07-CV-2085 (RRM)(RML), 2009 WL 3232856, at *13 (E.D.N.Y. Sept. 30, 2009).

## III. Title VII Retaliation Claims

Title VII makes it unlawful for an employer "to discriminate against any ... employee[ ] or applicant[ ] ... because [that individual] opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3(a). This anti-retaliation provision is intended to further the anti-discrimination provision's goals "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 63 (2006).

Retaliation claims under Title VII, like discrimination claims, are evaluated under a burden-shifting analysis. *Hicks v. Baines*, 593 F.3d 159, 164 (2d. Cir. 2010); *see McDonnell Douglas,* 411 U.S. at 802-05. First, the employee must establish a *prima facie* case of retaliation by

showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Baines,* 593 F.3d at 164 (internal quotation omitted). The employee's burden in this regard is "*de minimis,*" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* (internal quotation omitted).

If the employee sustains this initial burden, a presumption of retaliation arises, and the employer must articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* An employee can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause." *Id.* (citing *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990)). If the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the adverse employment action. *Id.* at 164-65.

An employee engages in a "protected activity" when she protests or opposes an employment practice that she reasonably believes, in good faith, violates the law. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006); *see* 42 U.S.C. § 2000e-. Informal as well as formal complaints can constitute a protected activity. *Sumner,* 899 F.2d at 209. An employee "may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks omitted).

Title VII's anti-retaliation provision applies broadly to "employer actions that would have been materially adverse to a reasonable employee or job applicant." *Burlington Northern*, 548 U.S. at 57. Actions are materially adverse for retaliation purposes if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination," and may extend "beyond workplace-related or employment-related retaliatory acts and harm." *Baines,* 593 F.3d. at 165 (citing *Burlington Northern,* 548 U.S. at 67). Nevertheless, "petty slights or minor annoyances that often take place at work and that all employees experience" do not constitute actionable retaliation. *Burlington Northern,* 548 U.S. at 68.

An employee may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or ... (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000); *see also Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993). "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection," *see Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010), but an intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice. *See Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (retaliation in the context of 42 U.S.C. § 1983); *Joseph v. Marco Polo Network, Inc.*, No. 09 Civ. 1597 (DLC), 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010) (retaliatory discharge from employment); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (same).

Bind alleges that HPD placed her under surveillance, and eventually terminated her

employment, because she repeatedly protested workplace hostility and anti-Semitism and

because she filed an EEOC complaint. *See* (Compl. ¶¶ 27, 29); (Pl.'s Opp'n Stmt. ¶¶ 12, 16.)[5]

To meet the protected activity and knowledge elements of her retaliation claim, Bind

must show that she directed HPD's attention to practices which she genuinely believed violated

Title VII. *See Kessler* 461 F.3d at 210. Four discrete occasions appear in the factual record: (i)

the e-mail of August 15, 2007, in which Bind voiced concerns about a "hostile work

environment" and "discriminatory Anti Semitic" treatment; (ii) the internal EEO complaint of

October 24, 2007, in which *inter alia* Bind voiced concern over "discriminatory, racial slurs and

hostile work atmosphere" and claimed to have been told in response that she was the "weakest

manager" and should "look for another job" if she didn't "shape up" (Neubarth Decl. Ex. G); (iii)

the November 14, 2007 request for reconsideration of her application for religious

accommodation, in which Bind stated that "following my verbal and written expression of my

criticism as to religious discrimination and the creation of a hostile work atmosphere I was

subjected to, I was intentionally transferred to an office located on Euclid avenue, Brooklyn"

(Seacord Decl. Ex. BB); and (iv) the EEOC complaint of January 15, 2008.[6]

As to the adverse employment action element of Bind's retaliation claim, Bind's

employment termination surely constitutes such an action. *Ellerth*, 524 U.S. at 761. Further, Title

VII's anti-retaliation protection is broader than its anti-discrimination protection and prohibits

[5] While Bind's complaint also claims that her transfer was retaliatory, *see* (Compl. ¶ 27), her opposition statement does not discuss staffing decisions or transfers, and she does not offer any evidence that the City's staffing choices were causally connected to her complaints. Thus, as with Bind's disparate treatment transfer claim, the Court considers her retaliatory staffing or transfer claims abandoned. Bind's further allegations of retaliation for her "religious expression," (Compl. ¶ 28), have been properly addressed under Bind's disparate treatment claim.

[6] Bind's CCHR complaint of November 28, 2007 would also have constituted a protected activity. However, Bind has not alleged or shown that HPD knew of the complaint before her termination, and thus cannot sustain a *prima facie* case for this protest. *See, e.g. Neale v. Dillon*, 534 F. Supp. 1381 (E.D.N.Y. 1982), *judgment aff'd*, 714 F.2d 116 (2d Cir. 1982).

30

some actions which might not affect the "terms and conditions of employment." *Baines*, 593 F.3d at 165 (citing *Burlington Northern*, 548 U.S. at 67). Although Bind does not allege that she knew of her surveillance until her termination, such surveillance can still constitute an adverse employment action under the broadened standard articulated in *Baines*. A reasonable employee in Bind's position "may well be dissuaded" from raising a discrimination grievance if she knew that she might be placed under surveillance outside work, let alone if such surveillance could give her employer new arguments for terminating her job. *See Baines*, 593 F.3d at 170 (quoting *Burlington Northern*, 548 U.S. at 69).

Regarding the final element of her claim, causal connection, Bind provides no direct evidence that a retaliatory animus links her protests to her surveillance or firing. Bind's *prima facie* case relies on indirect proof of causation, which consists of the temporal proximity between her protests and her surveillance, and the evidence discussed in section II.A *supra* that her surveillance and discharge were so flawed as to be pretextual.

The court finds that Bind establishes a *prima facie* case of retaliation at least as to her EEOC complaint. Bind's surveillance and termination commenced so soon after she filed the EEOC complaint that a jury could find inference of a causal relationship. As with Bind's discrimination claims, the City has offered a legitimate non-retaliatory reason for HPD's acts: the inconsistent justifications for Bind's accommodation requests were enough for HPD to question their sincerity, and Bind's perceived dishonesty was sufficient grounds for termination.

This leaves the ultimate question: whether Bind has presented sufficient evidence from which a reasonable jury could find retaliation. For the reasons in section II.A *supra*, the court finds that she has. Bind has raised genuine questions of fact as to whether her surveillance and resulting termination were a contrived reaction to her protected activity and whether the temporal

31

proximity of her EEOC complaint and her discharge was more than coincidence. Although the City has introduced evidence that Bind's termination was based on legitimate grounds, it has not succeeded in precluding the inference that its legitimate reasons served as a pretext for a retaliatory motive. *See Goldschmidt*, 380 F. Supp. 2d at 319.

Accordingly, defendants' motion for summary judgment as to Bind's Title VII retaliation claims is denied.

## IV. Bind's Claims under the NYSHRL

The Second Circuit has described claims under the NYSHRL and Title VII as "analytically identical." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008). New York courts require the same standard of proof for claims brought under the NYSHRL as for those brought under Title VII. *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 N.1 (2d Cir. 1999).

Accordingly, defendants' motion for summary judgment is granted as to Bind's hostile work environment claims under the NYSHRL, but denied as to Bind's adverse employment action and retaliation claims under the NYSHRL.

## V. Bind's Claims under the NYCHRL

Bind has failed to allege anywhere that her claims should be analyzed differently under the NYCHRL than under the NYSHRL or Title VII. Nevertheless, the Court must consider whether Bind's NYCHRL claims should be construed independently from her state and federal claims.

"[C]laims under the City HRL must be given 'an independent liberal construction' . . . . " *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009)). This construction must be

given "in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling ... the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart State or federal civil rights laws." *Williams*, 872 N.Y.S.2d at 31 (App. Div. 2009) (quoting Admin. Code of the City of New York, § 8-130).

It appears that the primary effect of the NYCHRL "liberal construction analysis" is to create an expanded definition of what constitutes an adverse action and a hostile work environment. The First Department has held that summary judgment under the current NYCHRL will still be appropriate "where [defendants] can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences." *Id.* at 41. The Second Circuit has also acknowledged that some state rulings treat the NYCHRL as having removed the "severe and pervasive" requirement from hostile work environment claims. *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 724 n.10 (2d Cir. 2010).

Bind's  hostile work environment claims still fails under the NYCHRL. Even if "less egregious conduct than that required under Title VII may support a hostile work environment claim under the NYCHRL," *Panzarino v. Deloitte & Touche LLP*, No. 05 Civ. 8502 (BSJ) (RLE), 2009 WL 3539685 (S.D.N.Y. Oct. 29, 2009), the severity of her co-workers' comments is not the determinative issue in the court's analysis. Rather, as discussed above, Bind has failed to offer sufficient evidence of a causal connection between the conduct and any identified change in the conditions of her employment.

Accordingly, defendants' motion for summary judgment is granted as to Bind's hostile work environment under the NYCHRL, but denied as to Bind's adverse employment action and retaliation claims under the NYCHRL.

**VI. Bind's claims against Carbine and Aragon**

Individuals are not subject to liability under Title VII. *Patterson,* 375 F.3d at 221, *quoting Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam).

However, § 296(6) of the NYSHRL provides that it "shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." The Second Circuit has held that § 296(6) offers a basis for employee liability for employees who "actually participated in the conduct giving rise to a discrimination claim" even if they have neither an ownership interest nor the power to hire and fire. *See Tomka v. Seiler Corp*., 66 F.3d 1295, 1317 (2d. Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*.

Further, § 8-107 (a) of the New York City Administrative Code expressly provides that it is unlawful for "an employer or an employee or agent thereof" to engage in discriminatory employment practices. Thus, liability may be imposed against supervisors or others in their individual capacity. *See Murphy v. ERA United Realty*, 674 N.Y.S. 2d. 415, 417 (App. Div. 1998). "The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is 'virtually identical.'" *Feingold*, 366 F.3d at 158 (2d Cir. 2004) (quoting *Dunson v. Tri-Maintenance & Contractors, Inc.*, 171 F. Supp. 2d 103, 113-114 (E.D.N.Y. 2001)).

Defendants do not address the NYSHRL or NYCHRL claims against the individual defendants in their present motion. Accordingly, the NYSHRL and NYCHRL employment action claims against Carbine and Aragon will not be dismissed.

## VII. Bind's claims against HPD

As a mayoral agency, HPD itself is not a suable entity. N.Y. City Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."); *Sanders v. New York City Dept. of Housing Preservation and Development*, No. 09 Civ. 4054 (RMB) (AJP), 2010 WL 3025651, at *1 n.1 (S.D.N.Y. July 28, 2010).

All of Bind's claims against the HPD itself are dismissed.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment **[27]** is GRANTED IN PART and DENIED IN PART.

Plaintiff's hostile work environment claims under Title VII, the NYSHRL and the NYCHRL are DISMISSED.

All claims against HPD are DISMISSED.

Plaintiff's adverse employment action and retaliation claims under Title VII, the NYSHRL and the NYCHRL against the City, Aragon, and Carbine remain in the case.


SO ORDERED.

Dated: New York, New York
      September **30**, 2011

                                               Richard J. Holwell
                                      United States District Judge